WATSON (THOMAS v.). See Case No. 13,-913.

WATSON (UNITED STATES v.). See Cases Nos. 16,651 and 16,652.

WATSON (WILSON v.). See Case No. 17,-847.

WATSON, The THOMAS. See Case No. 13,-933.

## Case No. 17,291.

### WATT v. POTTER.

[2 Mason, 77.] [1]

Circuit Court, D. Rhode Island. June Term, 1820.

TROVER—EVIDENCE OF CONVERSION—MASTER OF VESSEL—AUTHORITY—PARTIAL SALE OF CARGO — DAMAGES FOR CONVERSION — DEDUCTION OF DUTIES.

1. In trover, a mere demand and refusal is not in all cases evidence of a conversion. Where the demand is made by an agent, and the refusal is for defect of authority in the agent, or for a refusal to show his authority, it is not evidence of a conversion. Aliter where·there is no request to see the authority, and the refusal to deliver the property turns on other distinct grounds.
[Cited in Louisville & N. R. Co. v. Lawson, 88 Ky. 500, 11 S. W. 511; Page v. Crosby, 24 Pick. 216.]

2. A master of a ship loaded on freight, and having no consignment of the cargo, has no right to pledge or sell any part of the cargo at an intermediate port, short of the port of destination, except for necessary repairs and expenses, to enable him to perform the voyage. If he break up the voyage at an intermediate port, he has no authority to sell any part of the cargo to pay for advances to him to repair the ship for a new voyage, or to pay seamen's wages.

[1] [Reported by William P. Mason, Esq.]

3. Where goods are landed at such intermediate port, upon the ground of necessity, for the purpose of being re-exported, (they being prohibited by law from importation) on payment of duties, and they are there tortiously converted, the wrong doer has no right to a deduction from the damages, of the amount of the duties which would have become payable on the goods, if regularly imported, but the rule of damages is the market value of the goods at the time of the conversion.
[Cited in Bourne v. Ashley, Case No. 1,699.]
[Cited in Dent v. Chiles. 5 Stew. (Ala.) 383; Ripley v. Davis, 15 Mich. 80; Salt River Canal Co. v. Hickey (Ariz.) 36 Pac. 172; Walker v. Borland, 21 Mo. 292.]

Trover for two hundred and three hogsheads of rum. The plaintiff [Robert· Watt], a merchant of Jamaica, in March, 1819, shipped under a charter party on board of the British brig Fame, of Liverpool (James Handy, master), a large quantity of rum, on a voyage to Quebec, in Canada, consigned to Messrs. Ervin, M'Knight & Co. of that place, for sale. The brig, by the charter party, was to go from Jamaica to Quebec, and thence to return to Jamaica. The charter party stipulated for the payment of the freight of the outward voyage in advance, to the amount of £400 sterling. The vessel, after sailing on the voyage, put into Charleston in South-Carolina, in distress, and after undergoing repairs there, resumed her voyage, and afterwards put into Newport, Rhode-Island, under the same pretence. Here the master acting, as was suggested, with fraudulent intentions, broke up the voyage, procured a survey of the brig, and under this survey, which was without the sanction of any public authority, she was reported unseaworthy, and as such was sold for a trifling sum at public auction, and bought in by the defendant [Robinson] Potter, as he suggested, for the master, and soon afterwards she was refitted by the master, and sailed under his command on a new voyage to Wilmington in North-Carolina. On her arrival at Newport, as the importation of goods from a British colony, in a British ship, was prohibited by the late act of congress, the cargo was landed and warehoused under the authority and keys of the government, in the warehouse of the defendant, whom the master appointed his agent, and to whom he consigned the vessel and cargo, without the knowledge of the owners. The defendant acted as the agent and adviser of the master in all the subsequent proceedings. Afterwards, on the 3d of August, 1819, the master procured an entry at the custom-house, of part of the cargo, and among other things, of 36 puncheons of rum, a part of the plaintiff's shipment, for the purpose of paying the aleged expenses out of the proceeds, after deducting the duties due thereon. This portion of the cargo so entered, was afterwards sold at public auction, and the nett proceeds, after all deductions, amounting to about $2,-900, came into the hands of the defendant, who made advances from time to time, to

the master, as he required them. The master, on his arrival at Newport, applied to Mr. Gilpin for assistance and advice, who aided him in procuring the rum to be entered for sale, and advised with him from time to time. The residue of the cargo which remained unsold, being principally the 200 hogsheads of rum now sued for, was, on the departure of the master with the brig, left in the custody of Potter, and in his warehouse under the locks of the government, with a written authority to detain the same for the payment of $688, alleged to be then due to the defendant, for advances; and with directions to Potter to sell so much as might be necessary for that purpose. Potter also claimed a right to detain them until paid a sum for demurrage, which the master claimed, as well as a further sum due to himself, amounting in the whole, with the $688, to about $1,500. Mr. Gilpin afterwards entertaining doubts of the correctness of the transactions of the master, sent sometime in 1819, information of the facts to the consignees at Quebec, and received authority from them to act as their agent and the agent of the plaintiff in the business. He also received in February and March, 1820, letters from the plaintiff confirming his agency. He was expressly authorized, among other things, to demand the rum of the defendant, and to pay any charges which justly were due him, and for which the rum was liable. Mr. Gilpin accordingly on the 27th of March, 1820, made a demand of the 203 puncheons of rum now in controversy of the defendant, who declined delivering it up, unless the whole demand, amounting to about $1,500, was paid to him. Mr. Gilpin did not at this time produce his authority, nor did the defendant require it, but he stated that he was authorized by letters from the consignees and the plaintiff; but the controversy turning on the refusal to deliver the rum unless the whole account of the defendant was paid, and Mr. Gilpin declining to pay it, unless it was referred to some gentlemen to determine its reasonableness, the letters were not produced. and the defendant treated them very lightly, as of no consequence. Afterwards the defendant went to New-York, leaving an agent at Newport with instructions not to deliver the rum unless Mr. Gilpin had sufficient authority, and paid the whole of the account claimed by him. After this. and before the action was brought, Mr. Gilpin called on Potter's agent, showed him a certificate from the custom-house, yielding up the custody of the rum for the purpose of its being exported, and tendered him $800. in payment of all accounts due to the defendant, and demanded the rum; this he did. not admitting that sum to be due, but stating that he made the tender merely to end a disagreeable business. He did not show his instructions or authority, nor did the defendant's agent ask for them; but the latter offered to deliver the rum if the whole amount of $1,500 was paid, otherwise he refused to deliver it. The present action was then brought. At the trial, no account of the items of disbursements or advances was produced by the defendant, to show how the first balance of $688 arose, or for what purposes the money was advanced. But it was admitted that the net proceeds of the rum sold after deducting duties and charges, were about $2.900. It appeared, however, that a part of the advances were made for the master's and mariners' wages, and for the brig's repairs. The defendant, at the time of the advances, knew that the master was not consignee of the cargo, and was his adviser and friend as to all his transactions.

Hazard & Searle, for plaintiff.
Robbins & Hunter, for defendant.

STORY, Circuit Justice (after summing up the facts). The first question is, whether there has been a conversion in this case. This is a question of fact to be judged of by the jury under all the circumstances. A demand and refusal to deliver is not of itself a conversion; but it is evidence from which a jury may presume a conversion. Where a demand is made by an agent, and the party refuses to deliver to the agent, either because he has no authority, or declines to produce it, such a refusal under such circumstances, is not even evidence of a conversion, for every person in possession of property, has a right to retain it, until it is demanded by some person having, and if required, producing competent authority to demand it. I agree, therefore, to the authorities cited at the bar on this point, and admit their entire correctness. Esp. N. P. 590, cites 2 Bulst. 312; Solomons v. Dawes, 1 Esp. 83. But if the refusal do not turn upon the supposed want of authority, if the party waives any inquiry into the authority, or admits its sufficiency, and puts his refusal upon another distinct ground, which cannot in point of law be supported, there the refusal under such circumstances, is presumptive evidence of a conversion. If, for instance, the party puts his refusal upon the ground, that the property is his own, or that he has a lien upon it, and such claim is unfounded; or if his objection to a delivery be frivolous or fraudulent, there he cannot shelter himself from the legal presumption of a conversion, which his unjust refusal authorizes. Whoever undertakes tortiously to deal with the property of another as his own, or tortiously detains it from the owner, is in contemplation of law, guilty of a conversion of it.

These principles may be easily applied to the present case. It is not now disputed that Mr. Gilpin, as agent of the plaintiff, had full authority to demand the property. If then he tendered a sum to the defendant more than sufficient to pay all the just

claims, which he had against the property, and if the defendant was well satisfied of the existence of Gilpin's authority, and in fact waived any particular examination of it, claiming to retain the property upon other distinct grounds, which cannot in point of law be sustained, his refusal to deliver the property to Gilpin, is, under such circumstances, evidence of a conversion of the property.

This leads us to a consideration of the claims set up by the defendant. The principles of law applicable to these claims do not involve any real difficulty. Hardy, the master, was not the consignee of any part of the cargo, and had no other control over the cargo, than what belonged to him in his character as master. The brig was bound to Quebec, in Canada, and under the stipulations of the charter party, the cargo was there to be delivered to the consignees. Hardy, as master, had a right in the course of the voyage, in case of necessity, and to enable him to complete the voyage, to hypothecate the vessel or cargo, or to sell a part of the latter, for the payment of any necessary expenses incurred in any port into which the vessel might put in distress. The Gratitudine, 3 C. Rob. Adm. 240. If, therefore, it became necessary to repair the vessel at Newport, in order to proceed on the voyage, I have no doubt that the master might, upon the failure of all other means to obtain money, sell a part of the cargo for this purpose. But if, on the other hand, there was no intention to prosecute the voyage; if it were totally abandoned, either fraudulently or fairly, I do exceedingly doubt, if the master had any authority whatsoever to sell any part of the cargo for the payment of any expenses, except such as grew out of the circumstances of the cargo itself. It was not a sale for the benefit of the cargo, nor connected with the interests of the voyage; and the law has not invested him with any authority to my knowledge, under such circumstances, to apply one man's property to another man's use. But I dwell the less on this point, because the present suit is not brought to contest the sale already made of part of the cargo, or the application of the proceeds. It is brought only for the residue of the cargo yet remaining in the hands of the defendant. In the present case the master absolutely broke up the voyage at Newport, fraudulently, as it is contended, and certainly with much apparent reason, though I do not meddle much with that question. He procured the brig to be condemned by surveyors of his own voluntary appointment, and sold her at public auction for a paltry sum, as utterly unseaworthy. She was bought in, either for himself or for Potter, the defendant, and then refitted; and afterwards she proceeded upon a new enterprise to Wilmington, in North-Carolina. In what manner and for what purposes the proceeds of the cargo, which was sold, were applied, is unknown to the court, for the defendant has not chosen to submit to us any account whatsoever of his proceedings in this respect. It does however appear, that the master and seamen's wages for the voyage, as far as due, were paid out of the proceeds, as well as the repairs made upon the brig. Now the master certainly had no right to apply the proceeds of the cargo to the payment of his own or the seamen's wages, or to the disbursements and expenses of a new voyage, with which the plaintiff had no connexion. And if he fraudulently broke up the voyage at Newport, there is not a pretence to say, that he had any legitimate authority over the cargo, beyond that of providing for its safe custody. Now the defendant, as the agent of the master, could not place himself in a better situation than his principal. He was perfectly conusant of all the facts, and was the adviser of the master; and if he chose to make advances to the master, under such circumstances, knowing him not to be consignee of the cargo, it was at his own peril. The master could not give him any lien or security on the cargo for such advances, unless he could have sold or hypothecated a part of the goods for the same purpose; and we have already seen that he can do so only in cases of necessity in the course and for the accomplishment of the voyage. It is incumbent, therefore, on the defendant, to show what the advances were, and for what purposes made, and further to establish that the case was such in point of necessity, that the master might properly pledge the cargo for such advances. If he fail to show the necessity of such advances; or if he has been fully paid by the proceeds already in his hands, all that he could justly claim, as against the plaintiff; or lastly, if the sum tendered to him exceeded all that was rightfully his due, then the refusal to deliver the 203 hogsheads of rum was tortious, and the plaintiff may well maintain the present action. The defendant cannot set up a lien on the rum, which the master had no legal right to create. The case, indeed, would warrant me in holding still stronger doctrines; but I am persuaded that these are sufficient for its decision.

Another question has been made at the bar, whether the rum, though in the defendant's warehouse, being under the locks of the government, and in its custody, this action can be maintained against the defendant, it not being in his possession at the time of the demand and refusal. But I am of opinion, that this question does not in fact arise in this case. Previous to the ultimate demand, the government had expressly relinquished all control and custody of the rum; and this was made known to the defendant's agent. The defendant himself not only claimed at all times to be rightfully possessed of the property, subject to

the rights of the government, but actually claimed a lien on it to a considerable extent, founded on this possession. He never relinquished this possession, and it does not under these circumstances lie in his mouth to deny his possession for one purpose, and assert it for another.

The last question is, what is the rule by which the damages, if the plaintiff be entitled to recover, are to be assessed. I am of opinion, that the true rule is the value of the property at the market price, at the time of the conversion. The defendant claims to have a deduction made of the amount of duties which would accrue on the rum if regularly imported. At first, I inclined to think this deduction was reasonable, but on reflection, I have changed my opinion. No duties have been paid upon the rum, no duties are by law payable, for the rum was prohibited from importation from Jamaica, in a British vessel, by the recent act of congress. Act April 18, 1818, c. 65 [3 Story's Laws, 1677; 3 Stat. 432, c. 70]. The defendant never gave any bonds for the payment of duties, and is in no shape liable to pay them. The rum was landed for re-exportation, and the plaintiff was desirous, with the consent of government, of re-exporting it. But the defendant has wrongfully prevented the re-exportation. What right, then, can the defendant have to an allowance for duties which he has never paid, and is not liable to pay? What reason is there, that the plaintiff should suffer a loss, which has been occasioned by a tortious conversion of the defendant? In my judgment, it does not lie in the mouth of a wrong doer to set up such a claim. The duties may never yet become payable; and but for the wrongful act of the defendant, would not become payable; and if any loss be sustained, it should be borne by the party, through whose instrumentality it has occurred, and not by an innocent shipper.

Verdict for the plaintiff, for the full value of the rum, without deducting duties.